IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON DOOLEY, | ) | |
| | ) | Case No. 07 C 7249 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sharon Dooley ("Dooley"), filed suit against her former employer, Defendant Abbott Laboratories ("Abbott"), alleging various discriminatory employment practices. Specifically, in Counts I and III, respectively, Dooley claims that Abbott violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by failing to accommodate her disability, narcolepsy, and by retaliating against her. In Count II, Dooley claims that Abbott violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it eliminated her position and did not hire her for other open positions. Count IV of her Complaint stated a claim under Title VII of the Civil Rights Act of 1964, but she has abandoned that claim. Abbott moved for summary judgment. For the reasons stated, Abbott's Motion for Summary Judgment is granted.

## STATEMENT OF UNDISPUTED FACTS

Abbott, a large health care company, hired Dooley on January 3, 1995 as a secretary within its Corporate Health and Safety Division. (Pl. 56.1 Resp. ¶¶ 1, 4.)[1] In March 1998, Dooley received

---

[1] Citations to Dooley's Response to Abbott Laboratories' Local Rule 56.1 Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to Abbott's Objections and Answer to Plaintiff's Rule 56.1 Statement of Additional Undisputed Facts have been abbreviated to "Def. 56.1 Resp." Dooley failed to comply with L.R. 56.1. That rule allows parties to file a statement of undisputed material

a promotion to the position of Private Fleet and Division Health and Safety Coordinator. (Pl. 56.1 Resp. ¶ 6.) After Abbott spun-off one of its divisions, Dooley began reporting to the Warehousing Manager of the Distribution Center/Warehouse Frank Merlock ("Merlock") in August 2004. (Pl. 56.1 Resp. ¶ 7.) At that point, her shift was scheduled to begin at 7:00 a.m. each day. (Pl. 56.1 Resp. ¶ 14.)

As Private Fleet and Division Health and Safety Coordinator, Dooley oversaw Abbott's shuttle operations within Lake County, Illinois. (Pl. 56.1 Resp. ¶ 9.) Abbott's Health Systems Division conducted shuttle operations to coordinate moving bulky hospital equipment between Abbott's various warehouses and distribution centers as part of its supply chain strategy. (Pl. 56.1 Resp. ¶ 38.) To facilitate moving the equipment, the shuttle operation leased three truck cabs and seventeen trailers. (Pl. 56.1 Resp. ¶ 41.) After the 2004 spin-off, Abbott's shuttle operations in Lake County consisted of Dooley, four leased drivers and one leased dispatcher. (Pl. 56.1 Resp. ¶¶ 39-40.) In her role, Dooley reviewed the hours of the leased drivers, reviewed and reported fleet expenses, verified compliance with Department of Transportation, OSHA and HazMat regulations, acted as a back-up dispatcher, maintained departmental records and investigated complaints. (Pl. 56.1 Resp. ¶ 10.)

---

fact consisting of short numbered paragraphs. Ignoring that obligation, Dooley filed numerous lengthy paragraphs relating to a variety of unrelated or irrelevant topics that one cannot characterize as "short." Accordingly, Dooley forced the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *See Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, this Court will not consider portions of Dooley's submissions that do not conform to L.R. 56.1

*Dooley Requests Accommodations for Narcolepsy*

On September 17, 2004, Dooley informed Merlock that she suffered from narcolepsy – a condition characterized by overwhelming daytime drowsiness and sudden attacks of sleep. (Pl. 56.1 Resp. ¶ 15.) She explained that as a result of her condition, on some mornings it was physically impossible for her to open her eyes for periods of time ranging from fifteen to forty five minutes. (Def. 56.1 Resp. ¶ 2.) She told Merlock that she had difficulty making it to work in time for the start of her shift on mornings when she could not open her eyes. (*Id.*) She then asked Merlock for a flexible work schedule, where she could arrive to work at some time between the hours of 7:00 and 9:00 a.m. and work for the eight hours after her arrival time each day. (Pl. 56.1 Resp. ¶ 15; Def. 56.1 Resp. ¶ 7.) Merlock explained that giving her a variable start time would have a negative effect on the shuttling operation because the operation needed the coordinator to be on-site to function, so allowing her to have a variable start time could result in downtime for the other members of the operation while they waited for her to arrive. (Pl. 56.1 Resp. ¶ 17; Def. 56.1 Resp. ¶ 7.) Instead of offering her a variable start time, he moved her start time to 8:30 a.m. to give her more time to get to work. (Pl. 56.1 Resp. ¶ 16.)

Abbott examined Dooley's job responsibilities and changed her title to Transportation Environmental, Health and Safety Administrator on February 14, 2005, although her duties remained the same. (Pl. 56.1 Resp. ¶ 8.) She continued to report to Merlock, but she also reported to Team Leader Sue Bye ("Bye"). (*Id.*; Dooley Dep. at 116:10-13.)

On March 2, 2006, Dooley again requested that her shift begin whenever she arrived at work between 7:00 and 9:00 a.m and end eight hours thereafter. (Pl. 56.1 Resp. ¶ 18.) In response, Merlock again explained the difficulties that giving her a variable start time would have on the

shuttling operation.  (Pl. 56.1 Resp. ¶ 19.)  Instead of offering her a variable start time, he allowed her to choose any fixed start time between 7:00 and 9:00 a.m.  (*Id.*)  Although Dooley could have chosen to a start time of 9:00; she chose to keep her start time of 8:30 a.m.  (Dooley Dep. at 89:14-17.)  Despite agreeing to that arrangement, Dooley arrived late for work on seventeen different occasions during the first half of 2006.  (Pl. 56.1 Resp. ¶ 20.)  Dooley received her first written warning for tardiness from Abbott on August 18, 2006.  (Pl. 56.1 Resp. ¶ 21.)

In the fall of 2006, Dooley requested that her shift begin whenever she arrived at work between 7:00 and 9:00 a.m. for the third time.  (Pl. 56.1 Resp. ¶ 22.)  In support of her request, she submitted a note from her physician that warned "forcing [Dooley] to achieve a strict schedule potentially places her and others on the road at increased risk" because of her narcolepsy.  (Pl. 56.1 Resp. ¶ 23.)  Dooley's previous requests for a variable start time did not include a doctor's note warning of the risks associated with scheduling her for a fixed start time each morning.  (Pl. 56.1 Resp. ¶ 24.)  In November 2006, after receiving the documentation from Dooley's physician, Abbott granted her request for a variable start time and allowed her to start her shift at any time between 7:00 and 9:00 a.m.  (Pl. 56.1 Resp. ¶ 25.)  Additionally, Abbott informed Dooley that it would remove the written warning from her personnel file.  (Pl. 56.1 Resp. ¶ 26.)

After Abbott gave Dooley permission to start her shift at any time between 7:00 and 9:00 a.m., she claims that Abbott subjected her to harassment.  (Pl. 56.1 Resp. ¶ 27.)  For example, some of Dooley's coworkers asked her why she arrived at work early on some days but not on others.  (Pl. 56.1 Resp. ¶ 31.)  When she responded that she had narcolepsy and received a flexible starting time as an accommodation, two of her coworkers asked her further questions about her condition.  (Pl. 56.1 Resp. ¶ 34.)  However, nobody made derogatory remarks to her about narcolepsy or her

accommodation. (Pl. 56.1 Resp. ¶ 37.) Periodically, Dooley would get her blood drawn for medical testing during her lunch hour. (Pl. 56.1 Resp. ¶ 29; Def. 56.1 Resp. ¶ 16.) On one occasion, she returned to work late after having her blood drawn. (Pl. 56.1 Resp. ¶ 29; Def. 56.1 Resp. ¶ 16.) After that incident, Bye required notice if Dooley planned to have her blood drawn during her lunch break on that day. (Pl. 56.1 Resp. ¶¶ 29-30.) Additionally, Bye indicated that she needed to learn Dooley's job responsibilities. (Pl. 56.1 Resp. ¶. 33.) Once she began learning Dooley's responsibilities, Bye always wanted to know when Dooley was leaving her desk to attend meetings or investigations. (*Id.*; Def. 56.1 Resp. ¶ 16.)

*Elimination of the Shuttle Operations*

The lease and maintenance contracts on the shuttle operation's three truck cabs and seventeen trailers were scheduled to expire in January 2007. (Pl. 56.1 Resp. ¶ 41.) During the spring months of 2006, in anticipation of that expiration date, Merlock had Dooley and Howard Longo ("Longo"), one of her coworkers, prepare a report that compared the cost of operating the shuttling service in-house to the cost of outsourcing the shuttle operation to a third party trucking company. (Pl. 56.1 Resp. ¶ 42.) After collecting bids from three third party companies, Dooley and Longo reported their findings to Merlock in March 2006. (Pl.56.1 Resp. ¶ 43; Longo Aff. ¶ 4.) Once he analyzed their report and factored in other costs that outsourcing would eliminate, Merlock determined that Abbott would save over $100,000 annually by outsourcing the shuttle operations to a third party trucking company. (Pl. 56.1 Resp. ¶¶ 44-45.) Because of the amount of money that Abbott could save, Merlock considered eliminating Abbott's in-house shuttle operation to be an "obvious decision." (Pl. 56.1 Resp. ¶ 46.) In October 2006, Merlock informed his supervisor

5

Wayne Long ("Long") of the potential savings Abbott could achieve by hiring a trucking company to move the medical equipment.  (*Id.*)

On November 17, 2006, Merlock sent an outsourcing proposal to Elizabeth Bennett ("Bennett"), Abbott's Director of Global Logistics.  (Pl. 56.1 Resp. ¶ 47.)  On December 15, 1008, Abbott's Divisional Vice President of Global Supply Steve Lichter ("Lichter") approved Merlock's proposal to outsource the shuttle operation to a third party trucking company.  (Pl. 56.1 Resp. ¶ 48.)  Lichter did not know that Dooley suffered from narcolepsy or that Abbott had provided her with an accommodation for the condition in the form of a flexible starting time.  (Pl. 56.1 Resp. ¶ 49.)  On January 8, 2007, Merlock told Dooley that Abbott had decided to eliminate its shuttle operation.  (Pl. 56.1 Resp. ¶ 51.)  In response, Dooley began actively searching for another position within Abbott through the company's internal job posting website, which all Abbott employees could access.  (Pl. 56.1 Resp. ¶¶ 54, 75.)  Around the time that Abbott decided to eliminate its in-house shuttle operation, Abbott posted four available Distribution Center Servicer positions that reported to Merlock on the website.  (Pl. 56.1 Resp. ¶ 55.)  However, Dooley did not apply for any of those available positions.  (*Id.*)

On February 12, 2007, Merlock informed Dooley and five other contractors that Abbott had decided to eliminate their positions as a result of the decision to outsource the shuttle operation.  None of the other employees had requested an accommodation for a disability.  (Pl. 56.1 Resp. ¶ 53.)  (Pl. 56.1 Resp. ¶¶ 52-53.)  On that date, Abbott placed Dooley on 60-day salary continuation.  (Pl. 56.1 Resp. ¶ 52.)

*Dooley Searches for Another Position at Abbott*

While she was on 60-day salary continuation, Dooley continued to search for another position within Abbott. (Pl. 56.1 Resp. ¶ 57.) During that time, she applied for seven different positions that she discovered through Abbott's internal job posting website: Clinical Supply Senior Shipping Specialist, Accounting Technician, Document Specialist, Senior Accounting Technician (2 openings), Meeting and Events Coordinator and Secretary II. (Pl. 56.1 Resp. ¶¶ 58-59, 61, 69.) Dooley was 42 years old when she searched for another position at Abbott. (Def. 56.1 Resp. ¶ 1.) Although she applied for seven positions, she did not receive any of them. (Def. 56.1 Resp. ¶ 21.) Abbott filled four of the positions with employees older than Dooley: Clinical Supply Senior Shipping Specialist (Kristine Lowden, age 57), Document Specialist (Jeanette Amann, age 50), Accounting Technician (Stell Labus, age 54) and Senior Accounting Technician (Lorraine Richardson, age 47). (Pl. 56.1 Resp. ¶ 58.) Abbott did not hire anyone as a Meeting and Events Coordinator. (Pl. 56.1 Resp. ¶ 59.)

The other available Senior Accounting Technician position had responsibility for auditing and approving cash disbursements (ACR) and invoice payments, utilizing various payment systems and purchasing systems, investigating accounts payable transactions and compiling financial reports. (Pl. 56.1 Resp. ¶ 61.) The position required four years of relevant accounting or clerical bookkeeping experience along with prior ACR experience. (Pl. 56.1 Resp. ¶ 62.) Dooley's resume did not mention any experience with bookkeeping, accounting or ACR. (Pl. 56.1 Resp. ¶ 64.) Dan Fletcher ("Fletcher"), Senior Account Specialist, had responsibility for initially reviewing applications to determine if applicants met the requirements for the role of Senior Accounting Technician. (Pl. 56.1 Resp. ¶ 65.) After reviewing Dooley's resume, Fletcher determined that she

did not meet the requirements for the position. (Pl. 56.1 Resp. ¶ 66.) Therefore, he did not forward her application to the hiring manager responsible for filling the position and Dooley did not receive an interview. (Pl. 56.1 Resp. ¶¶ 66-67.) Fletcher did not know Dooley's age when he determined that she did not have the necessary qualifications for the Senior Accounting Technician position. (Pl. 56.1 Resp. ¶ 68.) Abbott eventually hired Ryan Howe ("Howe"), age 28, to fill the position. (Pl. 56.1 Resp. ¶ 61.) Howe had prior experience acting as an ACR group leader, which involved compiling spreadsheets of invoices and processing urgent ACRs, that made Howe an "optimum candidate" for the position of Senior Accounting Technician. (Pl. 56.1 Resp. ¶ 63.) Dooley admits that Howe's qualifications matched Abbott's needs for a Senior Accounting Technician better than hers did. (Pl. 56.1 Resp. ¶ 60.)

Dooley also applied for the position of Secretary II. (Pl. 56.1 Resp. ¶ 70.) Her resume reflected that she had three years of secretarial experience, but nine years had passed since she had last worked as a secretary. (Pl. 56.1 Resp. ¶ 70.) Kathleen Govekar ("Govekar") had responsibility for filling the Secretary II position. (Pl. 56.1 Resp. ¶ 72.) Govekar did not have any knowledge of Dooley's age when she decided to hire Marci Burr ("Burr"), age 30, for the position. (Pl. 56.1 Resp. ¶ 70.) Burr had acted as an executive secretary for senior level management and executives for the seven years preceding her application for the position. (*Id.*) Dooley admits that Burr's qualifications matched Abbott's needs for a Secretary II better than hers did. (Pl. 56.1 Resp. ¶ 60.)

On March 16, 2007, Dooley filed a charge of discrimination alleging disability discrimination, age discrimination and retaliation. (Pl. 56.1 Resp. ¶ 79.) She filed suit against Abbott on December 17, 2007. (Compl. ¶ 1.) In her First Amended Complaint, Dooley stated claims against Abbott for failure to accommodate under the ADA (Count I), age discrimination

(Count II), retaliation under the ADA (Count III) and retaliation for filing a charge of discrimination (Count IV). (Am. Compl. ¶1.) She has abandoned her claim in Count IV. (Pl. 56.1 Resp. ¶ 80.) Abbott now moves for summary judgment on Counts I-III, the remaining claims.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

I.  ADA Claims

In claims arising under the ADA, courts must make an initial inquiry into whether the plaintiff is "disabled" within the ADA's statutory definition.  *See Burnett v. LFW, Inc.*, 472 F.3d 471, 483 (7th Cir. 2006).  For purposes of its Motion for Summary Judgment, Abbott has conceded that Dooley is disabled under the ADA.

A.  Failure to Accommodate (Count I)

The ADA requires employers to make reasonable accommodations for an employee's known disability.  *See* 42 U.S.C. §§ 12112(b)(5)(A), 12112(a).  In order to prevail on a failure to accommodate claim under the ADA, the employee must show: 1) that he is a qualified individual with a disability; 2) that the employer was aware of the disability; and 3) the employer failed to reasonably accommodate the disability.  *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008).  Dooley claims that Abbott failed to reasonably accommodate her narcolepsy when it denied her requests for a flexible starting time in September 2004 and March 2006.

A plaintiff from Illinois who wishes to bring a claim for employment discrimination under the ADA must file a charge of discrimination with the EEOC within 300 days after the alleged discrimination occurred.  *See Huels v. Exxon Coal USA, Inc.*, 121 F.3d 1047, 1049 (7th Cir. 1997).  For purposes of the 300-day limitations period, the discrimination occurs "when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured."  *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001).  Typically, courts treat the failure to accommodate an employee's disability as a discrete discriminatory act that triggers the 300 day limitations period.  *See Horton v. Potter*, 369 F.3d 906, 910 (6th Cir. 2004); *Kaplan v. City of*

*Chicago*, No. 99 C 1758, 2005 WL 10265764, at *3 (N.D. Ill. Apr. 22, 2005) (Manning, J.);

*Kielbasa v. Ill. Envtl. Protection Agency*, No. 02 C 4233, 2003 WL 880995, at *4 (N.D. Ill. Mar. 3,

2003) (Lefkow, J.); *accord Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir. 1992) (finding

that an employer's refusal to undo an allegedly discriminatory decision is not a separate act of

discrimination for purposes of the statute of limitations under Title VII). However, a failure to

accommodate does not constitute a discrete act for purposes of the limitations period if it is a part

of a continuing violation. *See Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002);

*Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000) ("The continuing violation theory allows

a plaintiff to reach back to get relief for an act of discrimination that occurred outside the statute of

limitations by linking it as one continuous act with a discriminatory act that took place within the

limitations period."). A continuing violation occurs in one of three situations: 1) when an employer

makes employment decisions over time that make it difficult for the employee to determine the

actual date of discrimination; 2) when the employer makes decisions pursuant to an express

discriminatory policy; or 3) where discrete acts of discrimination are part of an ongoing pattern and

at least one of the discrete acts occurred within the relevant limitations period. *See Tinner*, 308 F.3d

at 707.

Here, the undisputed facts show that Abbott refused Dooley's requests for a flexible start

time in September 2004 and March 2006 before ultimately granting her request in November 2006.

In September 2004, when Merlock informed Dooley that she could not begin her shift at any time

between 7:00 and 9:00 a.m., he also informed her that she could start work each day at 8:30 a.m.

In March 2006, when Merlock again informed Dooley that she could not have a variable start time,

he told her that she could pick any fixed start time between the hours of 7:00 and 9:00 a.m.

Therefore, Dooley received actual notice that Abbott refused her requested accommodation in September 2004 and March 2006. The allegedly discriminatory failures to accommodate were discrete acts because she could pinpoint the exact date that Abbott refused her requests. Therefore, Dooley had 300 days from September 2004 and March 2006, respectively, to file a charge of discrimination with the EEOC to complain of Abbott's refusal to grant her requested accommodation. However, she did not file her charge of discrimination until March 16, 2007, more than 300 days after Abbott refused each of her requests for a variable start time.

Dooley contends that her situation fits the continuing violation exception to the statute of limitations because Abbott denied her requests for a variable start time pursuant to an express discriminatory policy. To support her contention, Dooley makes the conclusory statement that Abbott held a "systematic and openly espoused policy against the disabled." In order to establish a continuing violation under this theory, the plaintiff must show that the employer has an express policy that discriminates against a protected class. *See Steward v. CPC Int'l, Inc.*, 679 F.2d 117, 121 (7th Cir. 1982) (explaining that an express, openly espoused discriminatory policy existed when a company required women to retire at age 62 but required men to retire at age 65). Although Dooley claims that Abbott held an express, openly espoused policy against the disabled, she has not pointed to any evidence in the record to suggest that such a policy existed. To the contrary, Dooley admits that "[a]t all relevant times, Abbott had in place an Equal Employment/Affirmative Action Policy that prohibits discrimination and retaliation based on disability" that stated "It is the policy of Abbott Laboratories to ensure career opportunities without regard to race, religion, color, national origin, ancestry, sex, *age, disability,* marital status, veteran status, sexual orientation or citizenship status." (Pl. 56.1 Resp. ¶ 3 (emphasis in original).) Dooley has not produced any evidence of an express

discriminatory policy against the disabled and she concedes that Abbott had an express policy of *not* discriminating against the disabled. Therefore, she has not shown that Abbott's refusal of her requested accommodations constituted a continuing violation by reason of an express discriminatory policy. Because the undisputed facts establish that Dooley filed her charge of discrimination with the EEOC more than 300 days after the discrete acts that form the basis of her failure to accommodate claim occurred, her claim against Abbott for failure to accommodate her disability is time-barred.

The Court notes that even if the statute of limitations did not preclude Dooley's failure to accommodate claim, the undisputed facts show that Abbott provided Dooley with an accommodation for narcolepsy each time she requested one. The question of whether a requested accommodation is reasonable is a fact-specific inquiry that requires balancing the needs of both parties. *See Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). "An employer is not obligated to provide an employee the accommodation he requests or prefers[;] the employer need only provide some reasonable accommodation." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). When Merlock became aware of Dooley's condition in 2004, he pushed the start time of her scheduled shift back an hour and a half to make it easier for her to arrive to work on time. When Dooley requested a variable start time for the second time in March 2006, Merlock allowed her to pick any fixed starting time within the hours of 7:00 - 9:00 a.m. Each time he offered Dooley an alternative accommodation, Merlock explained that the shuttle operation needed to have her begin her shift at the same time each day so the team could schedule transportation of equipment in advance. After Dooley made her third request for a variable start time and produced a doctor's note in support of her request, Abbott granted the request and allowed

her to start her shift at any time between 7:00 - 9:00 a.m. In her brief, Dooley does not claim that the accommodations that she received in 2004 and 2006 were not reasonable accommodations for her narcolepsy. Although her doctor's note suggests that requiring Dooley to start her shift at a fixed time each day was not a reasonable accommodation for her in November 2006 when she made her third request for a variable start time because of the risk that she could pose to motorists, nothing in the record indicates that requiring Dooley to start her shift each day at a fixed time was an unreasonable accommodation at the time she made her first two requests for a variable start time in September 2004 and March 2006.[2]

Regardless, the undisputed facts establish that Dooley's failure to accommodate claims are time-barred because she failed to file her charge of discrimination with the EEOC within 300 days of Abbott's refusals of her requested accommodations in September 2004 and March 2006, the discrete acts that form the basis of her claims. Therefore, Abbott's Motion for Summary judgment

---

[2]Neither party addressed how a variable start time would actually accommodate the disability of narcolepsy. The Court questions how starting at 7 a.m. or 9 a.m. necessarily aids plaintiff's symptoms. The Mayo Clinic describes narcolepsy as being a condition characterized by an uncontrollable need to sleep during the day and states that people who suffer from the condition fall asleep without warning anywhere and at anytime. http://www.mayoclinic.com/health/narcolepsy/DS00345/DSECTION=symptons. The record contains no information that would support a finding that starting an 8 hour shift earlier on one day or later on another day would necessarily help an individual who, at any given moment throughout the day, requires sleep. There is no evidence, for example, that on a day when the defendant starts early, she can work the entire day without incident or on a day when she starts later, she can work the entire shift without incident. It would seem that her disability would manifest itself throughout the day regardless of the start time. Instead, it appears that the parties have assumed that the condition makes it only difficult to start work at a set time each day, yet that assumption does not appear to be consistent with the disability. Regardless, this failure to link the need for the variable start time with the symptoms of the disability, the Court's analysis remains the same that requiring Dooley to select a set start time and allowing her to select the late start time was not an unreasonable accommodation.

is granted with respect to Dooley's failure to accommodate claims because the undisputed facts show that it is entitled to judgment as a matter of law.

B. Retaliation (Count III)

Dooley claims that Abbott terminated her and subjected her to harassment in retaliation for receiving an accommodation under the ADA in November 2006. Specifically, with respect to her retaliatory discharge claim, Dooley contends that Abbott eliminated its shuttle program and outsourced the work to a third party trucking company in order to retaliate against her for receiving a variable start time to accommodate her condition. Before a plaintiff can succeed on a retaliation claim, she must show that the decision maker had actual knowledge that the plaintiff engaged in statutorily protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-669 (7th Cir. 2006); *Durkin v. City of Chicago*, 341 F.3d 606, 614 n.4 (7th Cir. 2003). When Abbott made the decision to eliminate the shuttle program and Dooley's position, the undisputed facts show that Lichter, Abbott's Divisional Vice President of Global Supply, decided to outsource the shuttle operations after reviewing a proposal that Bennett, Director of Global Logistics, had approved and forwarded to him. The undisputed facts also reveal that when he approved the outsourcing proposal he did not know that Dooley had a disability or that she had received an accommodation. Nothing in the record indicates that Lichter even knew of Dooley when he approved the outsourcing of the shuttle operation. Because Lichter did not know about Dooley's disability or accommodation when he decided to eliminate Dooley's position as part of the outsourcing of Abbott's shuttle program, he could not have possibly made the decision in order to retaliate against her for receiving an accommodation for narcolepsy.

Dooley also claims that the treatment she received from her coworkers after she received the variable start time shows that Abbott retaliated against her for receiving an accommodation. She claims that Abbott subjected her to harassment because her coworkers asked her why she would arrive early some days but late on other days after she received her accommodation. Once they learned that Dooley had narcolepsy, some coworkers asked her questions about the condition. Additionally, Dooley claims that her team leader, Bye, subjected her to harassment by requiring Dooley to provide notice on days that she planned to have her blood drawn for testing during her lunch hour.

A plaintiff may establish a prima facie case of retaliation under the ADA under either the direct or indirect method of proof. *See Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999). To state a claim for retaliation under the direct method, the plaintiff must show: 1) a statutorily protected activity; 2) an adverse employment action; and 3) a causal connection between the two. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). To make that showing, the plaintiff may use direct evidence or circumstantial evidence. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence essentially requires an admission that the decision maker took action against the employee based upon discriminatory animus. *See id.* Circumstantial evidence would allow a jury to infer that the decision maker took action based upon discriminatory animus. *See id.* Under the indirect method, the plaintiff establishes a prima facie case of retaliation by showing: 1) she is disabled under the ADA; 2) she was meeting her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees received more favorable treatment. *See Rooney v. Koch Air*, 410 F.3d 376, 380-81 (7th Cir. 2005).

To succeed under either the direct method or the indirect method, a plaintiff must show an adverse employment action. *See Squibb*, 497 F.3d at 786; *Rooney*, 410 F.3d at 380-81. Adverse employment actions are actions that would dissuade a reasonable person from engaging in a protected activity. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2008). Therefore, "[m]inor or trivial actions that make an employee unhappy are not sufficient to qualify as retaliation under the ADA." *Silk*, 194 F.3d at 800; *see also Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981 n.4 (7th Cir. 2008) (noting that "petty slights, minor annoyances and simple lack of good manners" do not rise to the level of materially adverse actions). Therefore, some examples of actionable adverse employment actions include termination, a decrease in salary, a less distinguished title, a material loss of benefits and significantly diminished material responsibilities. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001).

Here, the undisputed facts show that Dooley's coworkers were curious when they found out that she had received an accommodation. Once they learned that Dooley had narcolepsy, two of her coworkers asked her questions about her condition. Despite the interest in her condition and her accommodation, none of her coworkers made a single derogatory remark about her. While Dooley probably would have preferred that her coworkers did not ask her questions about her arrival times and her narcolepsy, such questions are examples "petty slights, minor annoyances and simple lack of good manners." *Breneisen*, 512 F.3d at 981. Dooley also claims that Bye started monitoring Dooley more closely than she did before Dooley received the accommodation. Dooley complains that Bye required Dooley to inform her if she planned on getting her blood drawn during lunch. However, the undisputed facts show that Bye did not require notification from Dooley until Dooley returned to work late after getting her blood drawn during her lunch break on one occasion.

Additionally, Bye asked Dooley to provide training to her regarding Dooley's job responsibilities. Once Dooley began the training, Bye asked Dooley to notify her when she was leaving the office to attend meetings or investigations. Despite this closer oversight from Bye, Dooley does not claim that she suffered a decrease in salary, a less distinguished title or significantly diminished job responsibilities. Although Dooley claims that some of the conditions of her work changed once she received the variable start time from Merlock, Dooley did not endure employment actions that would dissuade a reasonable person from asking an employer to accommodate a disability. The record reveals that at the worst, Dooley suffered as series of minor inconveniences from her coworkers that did not have a material effect on her salary or responsibilities. Therefore, Dooley cannot establish a prima facie case of retaliation under the ADA because she cannot show that she suffered an adverse employment action after she received her requested accommodation.

The undisputed facts show that Dooley cannot establish a prima facie case of retaliation for her termination or for the treatment she received from her coworkers after she received a variable start time. Therefore, Abbott is entitled to summary judgment on Dooley's retaliation claims as a matter of law.

II. ADEA Claim (Count II)

After Abbott eliminated the shuttle operation, it provided Dooley with 60-day salary continuation while she searched for another position at Abbott. Although Dooley applied for seven positions through Abbott's internal job posting website, Abbott did not hire her for any of the positions. Dooley claims that age discrimination is the reason that Abbott did not hire her.

The ADEA prohibits employment discrimination against employees over the age of forty. *See* 29 U.S.C. § 623(a)(1). To establish a violation of the ADEA, a plaintiff must demonstrate that

she suffered an adverse employment action because of her age.  *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993).  Plaintiffs may proceed under either the direct method or the indirect method.  *See Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008).  Dooley concedes that she cannot procede with her ADEA claim under the direct method.  (Pl. 56.1 Resp. ¶ 73.)  Because Dooley only attempts to proceed under the indirect method, to survive a motion for summary judgment, she must establish a prima facie case of age discrimination by showing that she: 1) was a member of a protected group; 2) sought a position for which she was qualified; 3) was not hired; and 4) the employer hired a younger person for the position.  *See Sembos v. Philips Components*, 376 F.3d 696, 700 (7th Cir. 2004).  Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to articulate an age-neutral justification for the employment decision.  *See Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).  After the employer provides an age-neutral explanation for the decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the stated reason is pretext.  *See id.*

Here, the undisputed evidence shows that Abbott hired someone older than Dooley to fill four of the open positions.  When she applied for the open positions, she was 42 years old.  Abbott filled the following positions with employees older than Dooley:  Clinical Supply Senior Shipping Specialist (Kristine Lowden, age 57), Document Specialist (Jeanette Amann, age 50), Accounting Technician (Stell Labus, age 54) and Senior Accounting Technician (Lorraine Richardson, age 47).  Because Abbott hired employees older than Dooley to fill those positions, Dooley cannot show the fourth element of her prima facie case, that the employer hired a person younger than the plaintiff, with respect to those four positions.  Additionally, the undisputed facts show that Abbott did not hire anyone to fill its vacant Meeting and Events Coordinator position.  Because Abbott did not hire

anyone to perform that role, Dooley cannot show that Abbott hired someone younger than her. Therefore, with respect to the positions of Clinical Supply Senior Shipping Specialist, Document Specialist, Accounting Technician, Senior Accounting Technician and Meeting and Events Coordinator, Dooley cannot establish a prima facie case of age discrimination.

Dooley also applied for two other positions at Abbott during her 60-day salary continuation period. Although she applied for the other open Senior Accounting Technician position and the open Secretary II position, the undisputed facts show that Abbott hired employees younger than her when it hired Ryan Howe (age 28) and Marci Burr (age 30). With respect to the Accounting Technician position, Abbott required four years of relevant accounting or clerical bookkeeping experience and ACR experience. Dooley admits that her resume did not reflect any experience with accounting, bookkeeping or ACR transactions. Because her resume showed that she did not have any of the required qualifications for the vacant Senior Accounting Technician position, Fletcher determined that she did not meet the job requirements and therefore he did not forward her resume to the hiring manager that conducted interviews for the position. Dooley has not put forth any evidence that would indicate that she possessed any of the necessary qualifications for the open Senior Accounting Technician position. Because the undisputed facts show that Dooley did not meet Abbott's requirements for the position, she cannot establish a prima facie case of age discrimination with respect to the Senior Accounting Technician position that eventually went to Howe.

With respect to the Secretary II position, the undisputed facts show that Dooley had previous experience as a secretary within Abbott. When Abbott first hired her in 1995, she worked as a secretary until 1998, when she received a promotion to health and safety coordinator of the shuttle

operation. Abbott does not challenge whether Dooley possessed the necessary qualifications for the Secretary II. Therefore, the undisputed facts show that Dooley was over 40 years old, was qualified for the position of Secretary II, but did not receive the job because Abbott hired someone ten years younger than her. Accordingly, Dooley has established a prima facie case of age discrimination under the indirect method with respect to the Secretary II job.

To satisfy its burden of articulating an age-neutral justification for hiring Burr instead of Dooley, Abbott states that Burr was more qualified for the position. To support its position, Abbott has established that Burr had served as an executive secretary within another organization where she assisted senior level management and executives for the seven years immediately preceding her application to Abbott. Because Abbott has articulated an age-neutral justification for hiring Burr over Dooley, the burden shifts back to Dooley to demonstrate that Abbott's justification is a mere pretext for intentional age discrimination.

An employer's proffered justification is a pretext when it is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999). Therefore, the inquiry focuses on whether the employer "honestly believed in the nondiscriminatory reasons it offered . . . ." *Id.* at 984. An employee may show pretext by presenting evidence that an employer's proffered reason is not credible because the reasons are factually baseless, were not the actual motivation for the decision, or were insufficient to justify the decision. *See id.* at 983.

Although Dooley had three years of secretarial experience at Abbott, the undisputed facts show that she had not worked as a secretary in the nine years preceding her application for the Secretary II position. She has not claimed that Abbott's stated reason for hiring Burr, that Burr was more qualified for the job, is factually baseless, a false motivation for the decision, or insufficient

to justify the decision to hire Burr instead of Dooley. She has not put forth any evidence that would permit the inference that Abbott did not believe that Burr was more qualified for the job than Dooley. Burr had at least seven years of recent secretarial experience, whereas Dooley only had three years of secretarial experience and she had not worked as a secretary for the nine years before she applied. Most critically, Dooley admits that when Abbott hired Burr to fill the vacant Secretary II slot, it hired the person whose qualifications matched Abbott's needs better. (Pl. 56.1 Resp. ¶ 60.) Because Dooley has failed to put forth any evidence that Abbott's age-neutral justification for hiring Burr over Dooley was a mere pretext for intentional age discrimination, and because Dooley has admitted that Abbott hired the better person for the position, Dooley has not met her burden of establishing by a preponderance of the evidence that Abbott's justification for its decision was pretextual. Therefore, her claim that Abbott engaged in age discrimination when did not hire Dooley as a Secretary II fails as a matter of law.

Although Dooley applied for seven positions at Abbott, the undisputed facts show that each of her age discrimination claims fail as a matter of law. Accordingly, Abbott is entitled to summary judgment on Dooley's ADEA claims.

### CONCLUSION AND ORDER

For the reasons stated, Abbott's Motion for Summary Judgment is granted. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   April 17, 2009

22